UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MONICA JEAN BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:19-CV-806 PLC |
| | ) | |
| ANDREW SAUL, [1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER

Plaintiff Monica Brown seeks review of the decision of Defendant Social Security Commissioner Andrew Saul denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act.  For the reasons set forth below, the Court reverses and remands the Commissioner's decision.

I.    Background

In February and March 2016, Plaintiff, who was born in January 1971, filed applications for DIB and SSI alleging she was disabled as of June 19, 2016 as a result of:  depression, anxiety, crying spells, chronic back pain, several bulging discs, left leg pain, hypertension, sciatica, "limited standing/walking/sitting," and "tingling and pain, bilateral wrists/hands." (Tr. 57, 70 159-66)  The Social Security Administration (SSA) denied Plaintiff's claims, and she filed a timely request for a  hearing before an administrative law judge (ALJ).  (Tr. 56-81, 93-94)  The SSA granted Plaintiff's request for review and conducted a hearing in March 2018.  (Tr. 29-55)

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted pursuant to Fed. R. Civ. P. 25(d).

In a decision dated June 15, 2018, the ALJ applied the five-step evaluation set forth in 20 C.F.R. §§ 404.1520, 416.920 and concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act[.]" (Tr. 10-22)  Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review.  (Tr. 1-4)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.      Evidence Before the ALJ[2]

Plaintiff testified that she had a twelfth-grade education and worked as a school bus driver from 2004 through 2015.  (Tr. 35-37)  Plaintiff explained that she resigned her position as a bus driver when her son "had a severe bad accident[.]"  (Tr. 38)  Plaintiff intended to return to work, "[b]ut then my leg – everything just went downhill with my body…."  (Id.)

When the ALJ asked Plaintiff the main reason she could not work, she answered that "the beginning was my crying," but she later developed "these muscle pains and – [] my head would just start hurting."  (Tr. 39) Plaintiff stated that she experienced "pain all over…. I have pain in my feet, my ankles, my wrists, my hands….. I got arthritis building in my right knee, too."  (Tr. 43-44)  Plaintiff explained that cold temperatures caused her pain to "flare-up," and she estimated that she experienced four or five "flare-ups" per month.  (Tr. 44)  In the past, Plaintiff received injections for pain, which "would help for … two to three weeks, but the pain's worse after they do them because I will get like, six at a time…."  (Tr. 46)  Plaintiff underwent lumbar surgery in April 2017, which "helped with the leg pain," but not her back pain.  (Tr. 45)

---

[2] Because Plaintiff does not challenge the ALJ's determination of her mental RFC, the Court limits its discussion to the evidence relating to Plaintiff's physical impairments.

Plaintiff spent a significant portion of her days "laid up on a heating pad, putting my legs [up] and elevating them because … my ankles will get swollen." (Tr. 44)  Plaintiff  tried to walk twenty to thirty minutes per day, depending on the temperature, because "it helps to keep my body moving." (Tr. 46-47)  However, some days, Plaintiff would "start walking 15 minutes and I have to stop and then go back home because – either my ankles are hurting too bad or my feet." (Tr. 47)  Plaintiff could not "sit for long periods of time" because her "body stiffens up." (Tr. 39)  Plaintiff also had difficulty using her hands, explaining that she could not "hold onto things," such as a cellphone, do buttons, or open jars and cans.[3] (Tr. 39, 47-48)  Plaintiff cooked meals for her family, but sometimes "I just lean against the counter or if I have to sit down, I'll get a seat." (Tr. 50).  Plaintiff was able to "drive 15 minutes to go to the doctor's, but I'm hurting by the time I'm there." (Tr. 39)

A vocational expert also testified at the hearing.  (Tr. 52- 54)  The ALJ asked the vocational expert to consider a hypothetical individual "limited to work within the sedentary exertional capacity" who was

> unable to operate foot control operations; is unable to climb ladders, ropes or scaffolds; can occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl. This individual is limited to frequent – no more than frequent bilateral fingering. This individual is to avoid extreme cold; is to avoid extreme vibration; to avoid operation and control of moving machinery; working at unprotected heights; and use of any hazardous machinery.  This individual is limited to occupations that involve only simple, routine, repetitive tasks; in a low-stress job defined as jobs that have only occasional decision-making required; [and] have only occasional changes in working setting….

(Tr. 52)  The vocational expert affirmed that such an individual could not perform Plaintiff's past work as a bus driver, but testified that he or she could work as a ticket-taker, touch-up circuit board

---

[3] Plaintiff later explained that she had difficulty gripping or holding "something small, like a pot," but did not have problems holding a plate.  (Tr. 50)

worker, or optical goods assembler.  (Tr. 53)  When the ALJ added the limitation of "no more than occasional bilateral fingering," the vocational expert stated that such limitation would preclude all work.  (Id.)  Additionally, the vocational expert opined that missing work more than once per month or being off task more than ten percent of the workday would eliminate all jobs.  (Tr. 53-54)

In regard to Plaintiff's medical records, the Court adopts the facts set forth in Plaintiff's statement of facts, as admitted by the Commissioner.  [ECF Nos. 13-1, 20-1]  The Court also adopts the facts set forth in the Commissioner's statement of additional facts, because Plaintiff does not dispute them.  [ECF No. 20-2]

## III.     Standards for Determining Disability Under the Social Security Act

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. § 423(a)(1).  The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months."  20 C.F.R. §§ 404.1505(a), 416.905(a).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...."  42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520(a), 416.920(a).  Those steps require a claimant to first show that he or she is not engaged in substantial gainful activity.  Id.  Second, the claimant must establish that she has a "severe impairment," defined as "any impairment or combination

4

of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.152(c), 416.920(c).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work."  Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quotation omitted).  At step three, the ALJ considers whether the Plaintiff's impairment meets or equals an impairment listed in 20 C.F.R., Subpart P, Appendix 1.  Id. at 404.1520(d).

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations."  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines whether the claimant can return to her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f); McCoy, 648 F.3d at 611.  If the claimant can still perform past relevant work, she will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step.  Id.

Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523.  At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform.   20 C.F.R §§ 404.1520(g), 416.920(g); Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).  If the claimant cannot make an adjustment to other work, then she will be found to be disabled.  20 C.F.R. §§ 404.1520(g), 416.920(g).

**IV.    ALJ's Decision**

In his decision, the ALJ applied the five-step evaluation set forth in 20 C.F.R. §§ 404.1520, 416.920.  (Tr. 10-22)  The ALJ determined that Plaintiff:  (1) had not engaged in substantial gainful activity since June 19, 2015; and (2) had the severe impairments of degenerative disc disease, fibromyalgia, obesity, major depressive disorder, anxiety, and post-traumatic stress disorder.  (Tr. 12)  In addition, the ALJ found that Plaintiff had the non-severe impairments of hypertension, osteoarthritis of the feet, and polysubstance abuse.  (Id.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13)

Based on his review of Plaintiff's testimony and medical records, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"  (Tr. 15-16)  In particular, the ALJ noted that Plaintiff's conservative treatment following surgery was not consistent with disabling levels of pain and she received "good relief from her pain medications."  (Tr. 20)  The ALJ found that Plaintiff had the RFC to perform sedentary work with the following limitations:

> the claimant is unable to operate any foot controls.  She is unable to climb ladders, ropes, or scaffolds, but she can occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl.  She is limited to frequent use of her hands for fine manipulation.  She is to avoid exposure to extreme cold.  She is to avoid extreme vibration, all operational control of moving machinery, working at unprotected heights, and the use of hazardous machinery.  She is limited to occupations that involve only simple, routine, and repetitive tasks in a low stress environment, defined as requiring only occasional decision-making and only occasional changes in the work setting.

(Tr. 14)

6

Based on the testimony of a vocational expert, the ALJ concluded that Plaintiff was unable to perform any past relevant work but had the RFC to perform other jobs that existed in significant numbers in the national economy, such as ticket taker, "touch up circuit board worker," and optical goods assembler.  (Tr. 21-22)   The ALJ therefore concluded that Plaintiff was not disabled.  (Tr. 22)

## V.   Discussion

Plaintiff claims that substantial evidence did not support the ALJ's decision because the ALJ failed to:  (1)  "point to some medical evidence to support the conclusion that [Plaintiff] could perform sedentary work"; and (2) properly weigh Plaintiff's testimony.  [ECF No. 13 at 2]  The Commissioner counters that the ALJ "properly evaluated the record, including Plaintiff's subjective symptoms and medical-opinion evidence."  [ECF No. 20 at 3]

### A.  Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)).  A court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome." Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir.

2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).  Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]"  Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

      B.  Some Medical Evidence

Plaintiff argues that substantial evidence did not support the ALJ's finding that she was capable of performing sedentary work because there was no medical evidence in the record addressing her ability to function in the workplace.  [ECF No. 13]  Plaintiff further contends that, because the ALJ discredited the only opinion evidence in the record relating to the effects of her physical impairments, the ALJ had a duty to obtain medical evidence addressing her functional abilities.  In response, the Commissioner asserts that the record "contained sufficient information for the ALJ to make an informed determination regarding Plaintiff's capacity to sustain work[.]" [ECF No. 20 at 16]

RFC is what a claimant can do despite her limitations and includes an assessment of physical abilities and mental impairments.  20 C.F.R. §§ 404.1545, 416.945. The RFC is a function-by-function assessment of an individual's ability to do work-related activities on a regular and continuing basis.  SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996).  It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, and the claimant's own descriptions of her limitations. Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, "a claimant's residual functional capacity is a medical question."  Lauer

v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)).  See also Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001).  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)).  "An administrative law judge may not draw upon his own inferences from medical reports."  Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (quotation omitted).

The medical records reveal that Plaintiff presented to pain specialist Dr. Shelton in January 2015 with a history of lower back pain radiating down her left lower extremity, as well as generalized joint pain in her hands.  (Tr. 348)  Plaintiff reported that the pain was worse with prolonged sitting, bending over, and standing.  (Id.)  Dr. Shelton noted left-sided lumbar paraspinal tenderness, instructed Plaintiff to try ibuprofen for joint pain, and continued her Norco.  (Id.)

Plaintiff reported worsening pain in September 2015, and Dr. Shelton increased her Norco, prescribed gabapentin, and ordered an MRI.  (Tr. 354-55)  An MRI of October 2015 revealed: "Multilevel degenerative findings of the lumbar spine … most pronounced at L3/4 and L4/5.  There are findings of both of these levels which would account for a left-sided radiculopathy."  (Tr. 325-36)  Dr. Shelton administered a translaminar epidural injection later that month.  (Tr. 357)  In December 2015, Dr. Shelton continued Plaintiff's Norco, gabapentin, and Zanaflex, and he prescribed Mobic.  (Tr. 400)  Dr. Shelton increased Plaintiff's Mobic dosages in February, March, and April 2016.  (Tr. 362, 364, 368)

When Plaintiff returned to Dr. Shelton's office in July 2016, he noted Plaintiff's left-sided lumbar paraspinous tenderness and administered an L3-4 intralaminar epidural steroid injection. (Tr. 548)  The following month, Plaintiff informed Dr. Shelton that the injection improved her leg

pain but not her back pain.  (Tr. 535)  Dr. Shelton administered another lumbar epidural steroid injection in September 2016.  (Tr. 896)

Plaintiff sought treatment for generalized musculoskeletal pain and fatigue from rheumatologist Dr. Shereen in October 2016.  (Tr. 618-200)  On examination, Dr. Shereen noted 18/18 fibromyalgia tender points, reduced range of motion in the lumbar spine, and generalized muscle tenderness with no muscle weakness or focal weakness.  (Tr. 619)  Dr. Shereen ordered x-rays, which showed:  mild degenerative changes in the right hand; minimal degenerative change in the joint of the left thumb; minimal degenerative changes in both feet; and mild sclerosis along the lower aspect of the left sacroiliac joint.  (Tr. 562-63)  At her follow-up appointment the next month, Dr. Shereen diagnosed Plaintiff with fibromyalgia and prescribed nabumetone.[4]  (Tr. 616)

In November 2016, Plaintiff returned to Dr. Shelton with reports of back pain radiating to her left hip and thigh.  (Tr. 492-95)  Dr. Shelton administered bilateral sacroiliac joint injections and discussed with Plaintiff a possible surgical referral.  (Tr. 495, 564)  Dr. Shelton administered another left-sided sacroiliac joint injection in December 2016 and L3-L4 epidural steroid injections in January and February 2017.  (Tr. 568, 981, 1021)   In March 2017, Plaintiff reported to Dr. Shelton some improvement with gabapentin, but she wished to consider surgical intervention for the persistent pain.  (Tr. 434-37)

---

[4] Plaintiff continued to see Dr. Shereen for generalized musculoskeletal pain and fatigue.  Dr. Shereen prescribed Cymbalta in February 2017, and he increased the dose in April 2017 when Plaintiff complained of swelling in her hands and feet.  (Tr. 606-08, 610-12)  In July 2017, Plaintiff informed Dr. Shereen that her pain and fatigue had improved some since she started swimming, and Dr. Shereen advised her to increase the duration and intensity of her exercise.  (Tr. 601-03)  When Plaintiff returned to Dr. Shereen's office in October 2017, she complained of pain and fatigue but reported continued improvement with regular swimming and walking.  (Tr. 597)  Plaintiff informed Dr. Shereen that the "[b]ack surgery did not help."  (Id.)

In April 2017, Plaintiff underwent an L3-L4 discectomy with excision of a herniated nucleus pulposus.  (Tr. 576, 789)  The following month, Plaintiff informed Dr. Shelton that her radiating leg pain had improved since surgery, but she complained of neck, upper back, and shoulder pain.  (Tr. 400)  In June 2017, Dr. Shelton noted  on examination Plaintiff's left-sided cervical tenderness, and he administered left-sided C3-6 cervical medial branch blocks and a left-sided occipital nerve block.  (Tr. 1101, 1104)

Plaintiff sought pain treatment from Dr. Sturm in July 2017, and he prescribed hydrocodone and ordered medical imaging.  (Tr. 785, 801)  MRIs performed the same day revealed:  moderate-sized disc herniation central to the right at T8-9 producing mild cord impingement; small disc protrusion central and to the right of midline at T9-10; mild diffuse disc bulging at T12-L1; minimal posterior disc bulging at C5-6; mild left foraminal narrowing at C4-5; post-surgical changes on the left at L3-L4; mild canal stenosis at L4-5 "secondary to mild diffuse disc bulging, ligamentous thickening, facet joint hypertrophy, and grade I degenerative spondylolisthesis"; mild foraminal narrowing at L3-L4; and mild diffuse disc bulging at T12-L1 and L2-3.  (Tr. 639-42, 645-46)

In August 2017, Plaintiff complained to Dr. Sturm of pain in her neck, lower back, hip, right knee, and right hip, and he refilled her medications, and he administered lumbar facet joint injections in September.  (Tr. 785, 794)  Later that month, Plaintiff informed Dr. Sturm that she was trying to walk more but exercise was not helping her pain.  (Tr. 785)  Dr. Sturm performed additional lumbar injections in October 2017. (Tr. 794)

A lumbar MRI performed in November 2017 was "stable when compared to July of 2017" and showed "[s]evere facet joint osteoarthritis," "mild to moderate spinal canal stenosis with mild to moderate right and left foraminal stenosis" at L4-L5, and "moderate to severe disc height loss"

at multiple spinal cord segments.  (Tr. 638)  In December 2017, Plaintiff informed Dr. Sturm that she wished to "hold off on any further injections."  (Tr. 794)

In January 2018, Plaintiff complained to Dr. Sturm of back and neck pain, which increased with bending, driving, going up or down stairs, walking, standing up, prolonged sitting or standing, and changes in weather.  (Tr. 784)  Plaintiff rated her pain as 10/10 at its worst, 6/10 at its best, and 8/10 generally, and her medications included meloxicam, gabapentin, and hydrocodone.  (Id.) Dr. Sturm listed the following diagnoses for Plaintiff:  lumbar facet joint pain, recurrent right knee instability, right knee DJD, fibromyalgia, rheumatoid arthritis, multiple joint pain, lumbar spine pain, cervical spondylolysis, cervical radiculopathy, and chronic headaches.  (Tr. 784-85)  On the same day, Dr. Sturm completed a six-question "pain questionnaire" for Plaintiff, stating that: Plaintiff's pain was credible; she "cooperate[d] with treatment/efforts to relieve pain"; and her pain would result in her missing thirty days of work per month.  (Tr. 657)

In his decision, the ALJ summarized Plaintiff's medical records and medical opinion evidence.  (Tr. 16-18)  The only medical opinion in the record relating to Plaintiff's physical impairments was the pain questionnaire completed by Dr. Sturm in January 2018.  While the questionnaire did not contain a function-by-function assessment, it required Dr. Sturm to estimate the number of days of work Plaintiff would miss each month due to debilitating pain.  Dr. Sturm opined that Plaintiff would miss thirty days of work per month.  The ALJ assigned Dr. Sturm's opinion "little weight," reasoning:  "There is no medical evidence to support the extreme statement that she would miss 30 days of work due to pain such as frequent emergency room visits or extended hospitalizations.  The physical examinations do not indicate that severity of pain in the objective findings."  (Tr. 19-20)

In formulating Plaintiff's RFC, the ALJ summarized the objective medical evidence, including the imaging results and physical examinations, and determined that Plaintiff was capable of sedentary work with additional postural and environmental limitations.[5] (Tr. 20)  In the absence of medical opinion evidence, the ALJ relied, in part, on Plaintiff's physical examinations, which reflected positive straight leg raising and a sometimes antalgic gait, but "no consistent loss of strength or sensation" and "no motor weakness."  (Tr. 20)  However, it is not clear "how these observations made during a medical examination relate to Plaintiff's functional ability in the workplace." Priddy v. Saul, No. 4:19-CV-945 RLW, 2020 WL 7024237, *8 (E.D. Mo. Nov. 30, 2020).  The ALJ does not explain how these isolated normal findings support the conclusion that Plaintiff could perform the demands of sedentary work.  An ALJ "may not simply draw his own inferences about [a] plaintiff's functional ability from medical reports." Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004) (citing Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003)). See also Snider v. Colvin, 4:15-CV-641 SPM, 2016 WL 5076188, at *5 (E.D. Mo. Sept. 20, 2016).

In support of his finding that Plaintiff could perform sedentary work, the ALJ also cited evidence that Plaintiff was able to do "some exercise in the form of walking and swimming."  (Tr. 20)  He failed to explain, however, how this medically prescribed physical activity evidenced Plaintiff's ability to sit for the majority of an eight-hour workday, as required to perform sedentary

---

[5] The regulations define "sedentary work" as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

work.  See  20 C.F.R. §§ 404.1567(a), 416.967(a).  The ALJ drew his own inferences from the medical evidence in finding that Plaintiff could perform sedentary work.  "Unless the inferences are supported by opinions from treating or consultative experts, they do not constitute substantial evidence."[6] Wilkins v. Colvin, No. 4:15-CV-978 RLW,  2016 WL 5334976, at *6 (E.D. Mo. Sep. 22, 2016) (quoting Hess v. Colvin, No. 4:14-CV-1593 CDP, 2015 WL 5568056, at *11 (E.D. Mo. Sep. 22, 2015) (citation omitted)).  See also Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008) ("an ALJ must not substitute his opinions for those of the physician"); Pates-Fire v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009) (noting ALJs may not "play doctor").

Other than Dr. Sturm's opinion, which only estimated Plaintiff's monthly absences and which the ALJ gave little weight, the record contained no opinion evidence – treating, consulting or otherwise – addressing Plaintiff's ability to function in the workplace.  In his brief, the Commissioner correctly asserts that the absence of medical evidence does not necessarily require remand.  The Eighth Circuit has held that, in the absence of medical opinion evidence directly addressing a claimant's ability to function in the workplace, mild or unremarkable objective medical findings and other evidence might constitute sufficient medical support for an RFC finding.  See Hensley, 829 F.3d at 929-34; Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008).

---

[6] The ALJ also noted, in support of his finding that Plaintiff could perform sedentary work that, following her April 2017 surgery, Plaintiff received conservative treatment and declined additional physical therapy and injections.  Plaintiff's records reveal that, after that after her surgery, Plaintiff continued to receive numerous treatments including epidural steroid injections, facet block procedures, and narcotic and non-narcotic pain medications, which is consistent with her claims of significant impairment.  See O'Donnell v. Barnhart, 318 F.3d 811, 817 (8th Cir. 2003) (use of narcotic medications and numerous attempts to find pain relief supported the plaintiff's claims of impairment).  To the extent that Plaintiff declined further injections, her medical records and testimony established that the relief she received from the injections was short-lived.

14

Here, the record did not contain generally mild or unremarkable objective findings or other medical evidence that tended to support the ALJ's RFC determination.  Plaintiff's voluminous medical records contained a combination of normal and abnormal objective findings, with several consistent and significant abnormal findings.  For example, Plaintiff's physical examinations, even after the April 2017 surgery, showed paraspinal tenderness, positive straight leg raising, pain with range of motion, and generalized muscle tenderness. Likewise, the impressions in the medical imaging were not limited to mild or unremarkable findings.  Plaintiff's most recent MRI showed severe facet joint osteoarthritis and mild to moderate spinal canal stenosis with mild to moderate right and left foraminal stenosis.  Furthermore, Plaintiff consistently reported neck and back pain that worsened with physical activity, even when taking her pain medications.  Plaintiff's medical records appeared to support her assertion that she had chronic pain that significantly impacted her ability to sit, stand, or walk for prolonged periods of time.  See e.g., Massa v. Saul, No. 4:18-CV-877 SPM, 2019 WL 4305010, at *6 (E.D. Mo. Nov. 11, 2019).  Under the circumstances here, when evaluating Plaintiff's RFC, the ALJ "was required to consider at least some supporting evidence from a medical professional." Lauer, 245 F.3d at 704.  See also Wilson v. Saul, No. 4:17-CV-2044 PLC, 2020 WL 2800464, at *7 (E.D. Mo. May 29, 2020).

While it is the claimant's burden to establish her RFC, the ALJ has an independent duty to develop the record.  Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).  "[T]he ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004) (quoting Nevland, 204 F.3d at 858). In some cases, the duty to develop the record requires the ALJ to obtain additional medical evidence, such as a consultative examination of the claimant, before rendering a decision. See 20 C.F.R. §§ 404.1519a(b), 416.945a(b).

Upon review, the Court finds that the record is underdeveloped in that there is no medical evidence addressing how the claimant's physical impairments affected her ability to work.  As a result, the ALJ's RFC assessment was not supported by "some medical evidence" that addressed her ability to function in the workplace.  The Court therefore reverses and remands the case for further consideration.[7]  See Hutsell, 259 F.3d at 712 (reversing and remanding because the ALJ's RFC assessment was not properly informed and supported by some medical evidence in the record).

## VI.    Conclusion

Because the ALJ's RFC assessment was not supported by "some medical evidence" in the record that addressed Plaintiff's physical ability to function in the workplace, the Court reverses and remands this case for further consideration.  Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE


Dated this 31st day of March, 2021

---

[7] Because the Court finds that "some medical evidence" did not support the ALJ's RFC determination, the Court does not consider Plaintiff's claim that the ALJ failed to properly consider her testimony.

16